# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 18, 2003 Session

## SCOTT GRAHAM HARTMAN, ET AL. v. THE STATE OF TENNESSEE, ET AL.

**A Direct Appeal from the Tennessee Claims Commission**
**No. 85209      William Baker, Commissioner**

---

**No. M2002-01430-COA-R3-CV - Filed April 14, 2003**

---

Student-athlete entered into athletic scholarship with University under which University agreed to furnish medical treatment for any injuries incurred during athletic competition. Student-athlete suffered catastrophic injury during competition. At the time of his injury, student-athlete was an enrolled Eligible Dependent under an insurance plan father purchased through his employer. Pursuant to this plan, and the subrogation provision contained within, employer paid a significant portion of student-athlete's medical expenses for a specific three-year period. Employer ratified original contract action of student-athlete and parents against University and State, and sought to recover medical expenses paid pursuant to the plan's subrogation provision. Claims Commission granted summary judgment in favor of employer, ruling that employer was entitled to recover medical expenses from University. Commission denied claimants' request for prejudgment interest. University appeals Commission's summary judgment ruling, and claimants appeal Commission's denial of prejudgment interest. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Commission Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY KIRBY LILLARD, J., joined.

Ronald C. Leadbetter, Peter M. Foley, Knoxville, For Appellant, State of Tennessee

Paul S. Davidson, Joel L. Galanter, Nashville, For Appellees, Scott Graham Hartman, Kay Hartman, his mother an duly qualified conservator and guardian, and Cleon Hartman

# OPINION

This case is before the court for the third time. The claimant, Scott Graham Hartman ("Hartman"), is the son of claimants Kay Hartman[1] and Cleon Hartman. In September 1996, Hartman entered into an athletic scholarship contract with the University of Tennessee ("University"). Pursuant to this contract, the University was bound to furnish Hartman medical treatment in the event plaintiff was injured during athletic competition. The facts of this case were succinctly stated by Judge Todd in ***Hartman v. University of Tennessee***, No. 01A01-9804-BC-00196, 1998 WL 639121 (Tenn. Ct. App. Sept. 14, 1998). We quote the relevant facts at length from this opinion:

> The University purchased from National Union Insurance Company, a policy of insurance insuring its liability under scholarship contracts to the extent of the coverage provided by the policy. The father of the student [Hartman] was an employee of BellSouth Corporation which provided for the families of its employees health care insurance within designated limits.
>
> With the approval of the University of Tennessee, [Hartman] traveled to Lexington, Ky., to participate in a regional track and field competition sponsored and controlled by the University of Kentucky. While performing "warming up" exercises in the space assigned to him by the University of Kentucky, [Hartman] was struck in the head by a heavy missile thrown by another student who was participating in the same regional competition. His serious injury will require custodial care for the remainder of his life. The University of Tennessee has agreed to furnish all needed future care.

*Id*. at \*570-71.

At the time of his son's injury, Cleon Hartman was employed with BellSouth Corporation ("BellSouth"). As an employee of BellSouth, Cleon Hartman purchased a medical assistance plan ("ERISA Plan") that provided insurance coverage to Cleon Hartman. The parties dispute whether the ERISA Plan extended coverage to Scott Hartman. The ERISA Plan was in effect on April 17, 1987, the date of Scott Hartman's injury, and from April 1987 to February 1990, BellSouth's insurer paid $1,223,513.00 toward Hartman's medical care pursuant to this plan.[2]

---

[1] Following Scott Hartman's injury, Kay Hartman was appointed as her son's legal representative, and thereby accepted responsibility for all decisions regarding son's medical care.

[2] Pursuant to a settlement agreement, National Union Insurance Company ("National") later reimbursed BellSouth in the amount of $196,848.58, for medical expenses accumulated by Hartman from July 24, 1987 through April 17, 1993. National's payments under the settlement agreement exhausted the University's coverage.

The procedural history of this case is long and complicated, and was aptly summarized by Judge Cain in *Hartman v. University of Tennessee*, 38 S.W.3d 570 (Tenn. Ct. App. 2000). We quote at length from the court's opinion:

> [On April 15, 1998,] [t]he claimants filed in their own name a broad-based claim in both contract and tort against the University of Tennessee and the State of Tennessee[3] which was decided by the Claims Commission in March of 1998. All issues were resolved except the alleged subrogation claim for BellSouth in the amount of $1,026,666. In this respect, the Claims Commission held in part:
>
> > [W]hile the BellSouth plan may have a claim against the University or the State based on a theory of subrogation, insuperable barriers exists to this Commission's consideration of such a claim. (a) Neither in the original pleadings instituting this claim, nor in the subsequent pleadings and filings, have the parties claimed, asserted, discussed, or raised the issue of subrogation, except for a mention of the plan's potential subrogation rights in the form of an order the claimants submitted in connection with the motion now under consideration. Thus, the subrogation issue properly is not before this Commission. (b) This Commission's procedures require both that proceedings be brought by the real parties in interest, and that all necessary parties be joined in the proceedings if possible. The BellSouth plan is the real party in interest, and a necessary party in any action for subrogation, and the plan is not a party to this proceedings. (c) This Commission lacks jurisdiction to consider and decide a claim of a party not properly before it, where there is no evidence about whether that party has even asserted the claim against the State or the University. Tennessee Code Annotated section 9-8-307. In short: the claim for subrogation belongs to the BellSouth plan and not to the claimants, and the plan is not a party to this claim.
>
> On appeal, this court affirmed the judgment of the Claims Commission holding that nothing appeared in the record to indicate anything about a subrogation claim and making the following

---

[3] For the sake of convenience, we will refer to both defendants' as the "University" hereinafter.

observation: "In the present case, the volunteer subrogors are seeking to recover in their own names, funds which may or may not be justly due a third party which is not a participant in this proceeding and the basis of whose rights is not in this record." ***Hartman v. University of Tennessee***, No. 01A01-9804-BC-00196, 1998 WL 639121, at \*3 (Tenn. Ct. App. Sept. 14, 1998). The Court then observed that "the way is open for the third party subrogee to assert its rights, if any, in a separate claim to the Claims Commission." ***Id***.

In disposing of a petition to rehear filed by the claimants this Court held as follows: "The whole difficulty could have been avoided if the Hartmans had simply stated in their claim that it was presented on behalf of named subrogees, or had amended their claim to include such a statement. They did not do so, and the record on appeal fails to show that they ever paid any expense. Therefore, they are not entitled to recover anything in this proceeding for their own benefit, and they have not legitimately pursued the path that would entitle them to recover for the benefit of anyone else.*"* ***Hartman v. University of Tennessee***, No. 01A01-9804-BC-00196, 1998 WL 702057 (Tenn. Ct. App. Oct. 9, 1998).

The Supreme Court of Tennessee denied an application for permission to appeal in March 1999. The case was remanded back to the Claims Commission, and on March 10, 1999, the claimants filed a "Notice of Joinder of BellSouth Corporation" and "BellSouth Corporation's Ratification of Claims." On March 25, 1999, the [University and State] filed a motion to strike claimants' March 10, 1999 pleadings. This motion was sustained by the Claims Commission on May 10, 1999 wherein the Commission held:

> The proposed joinder of BellSouth comes too late. Proposing such a joinder almost twelve years after this claim was filed, three years after the State raised the real-party-in-interest issue, practically a year after this Commission's judgment, and also after consideration by both the Court of Appeals and the Supreme Court – such a joinder simply is not timely.
>
> *******************************************
>
> Finally, BellSouth's position must be rejected on sound judicial-policy grounds. To let BellSouth enter this claim after the action taken by the Court of

> Appeals and the Supreme Court would mock finality
> of judicial decisions, and would invite a waste of
> appellate courts' time and resources.
>
> BellSouth has just waited too long.

*Id*. at 571-72.

Hartman again appealed the decision of the Tennessee Claims Commission ("Commission") to the Tennessee Court of Appeals. In previously-mentioned ***Hartman v. University of Tennessee***, 38 S.W.3d 570, 577 (Tenn. Ct. App. 2000), the court reversed the Commission's decision, holding:

> The trial court erred in striking the March 10, 1999 "Notice of Joinder of BellSouth Corporation" and "BellSouth Corporation's Ratification of Claims." These pleadings, albeit late filed, are adequate to bind BellSouth Corporation under res judicata principles to whatever final judgment is ultimately entered in this case. The purpose of [Tennessee Rule of Civil Procedure] 17.01 is thus served and the "relation back" provisions of the Rule are applicable to the end that the case should be tried on its merits.

On April 2, 2001, the University filed a Motion to Dismiss on the grounds that the court lacked subject matter jurisdiction over the action as it was barred by the doctrine of sovereign immunity. The University's Motion to Dismiss was overruled, and in January of 2002 the University filed a Motion for Summary Judgment regarding BellSouth's subrogation claim. Shortly thereafter, claimants filed a Cross Motion for Summary Judgment, seeking "entry of a Judgment in their favor in the amount of $1,026,666.00 together with interest from February 1, 1990, for the University's remaining contractual liability for unreimbursed medical treatment."

In an Order filed May 13, 2002, the Commission concluded that Hartman had a contractual right to require the University to pay medical expenses incurred by the claimant as a result of the care and treatment he received for his injury, and further determined that BellSouth was subrogated to this right. The Commission ordered the University to reimburse BellSouth in the amount of $1,026,666.71, but denied claimants' request for prejudgment interest.

The University appeals, presenting for review the primary issue of whether the Commission erred in granting summary judgment in favor of BellSouth. Claimants raise the additional issue of whether the Commission erred in refusing to award prejudgment interest.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. ***See Bain v. Wells***, 936 S.W.2d 618, 622

(Tenn. 1997).  On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence.  *See id*.  In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial.  In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id*. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion.  *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).  Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment.  *See Bain*, 936 S.W.2d at 622.  Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court.  *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

**I.**

The University presents for review the issue of whether the Commission erred in granting summary judgment in favor of BellSouth.  Specifically, the University contends that the Commission erred in the following judgments:

> A. By concluding that BellSouth had a contractual obligation to make payments for which it now seeks recovery in this action;
>
> B. By concluding that BellSouth's subrogation rights were contractual in nature; and
>
> C. By concluding that BellSouth's subrogation rights were superior to those of the University.

Addressing the University's first allegation of error, we find unrefuted evidence in the record to indicate that BellSouth did in fact have a contractual obligation to make payments toward Hartman's medical expenses pursuant to its ERISA Plan.  The University admits that Hartman was an Eligible Dependent according to the terms of the ERISA Plan, but argues that there is no evidence to prove that Hartman was an enrolled Eligible Dependent, and thereby a participant under the plan.

BellSouth's ERISA Plan defines "participant" as "[a]n enrolled Participant/retired Participant and their enrolled eligible dependents (in [Medical Assistance Plan])."

This court's inquiry therefore centers on the question of whether the record contains indisputable evidence indicating that Hartman was an enrolled eligible dependent, and subsequently an insured party to the contract, under this particular plan. Because no copy of the original policy was included, nor any documentation of premiums paid entered, we turn to the affidavits of Cleon Hartman and Edward L. Rankin[4] ("Rankin") for proof that Hartman was an enrolled Eligible Dependent under BellSouth's ERISA Plan.

In his affidavit, Cleon Hartman affirmed that he was the beneficiary of BellSouth's self-insured ERISA Plan on April 17, 1987, the date of his son's devastating injury. According to Cleon Hartman, "BellSouth's ERISA Plan provided for the payment of necessary medical expenses of affiant's son, Scott Hartman." Cleon Hartman noted that "BellSouth authorized its ERISA Plan to pay Scott Hartman's medical expenses, provided that it reserved the right to recover those paid medical expenses from the University," and further stated that BellSouth paid $1,223,515.29 for medical services accumulated by Hartman from April 17, 1987 through February 1, 1990, pursuant to this plan.

Rankin testified that Cleon Hartman was a BellSouth employee and an "Eligible Employee" under the ERISA Plan on the date of his son's injury. Rankin affirmed that "[o]n April 17, 1987, and at all relevant times thereafter, Scott G. Hartman, the then adult son of Cleon Hartman, was a medical plan eligible dependent while he was a full-time student at the University of Tennessee." Rankin further noted that "[a]ll medical expenses paid by the Medical Plan in behalf of Scott G. Hartman were made under the terms and conditions of the Medical Plan," and "[a]ll of said payments made in behalf of Scott G. Hartman were subject to the Medical Plan subrogation provisions." Rankin reiterated that BellSouth paid $1,223,515.29 in medical services for Hartman under the ERISA Plan, covering the time period of April 17, 1987 through February 1, 1990.

Claimants' assertion that BellSouth was contractually obligated to pay Hartman's medical expenses pursuant to the ERISA Plan is further strengthened by claimants' Concise Statement of Undisputed Material Facts, and the University's admission of or failure to deny particular statements therein. The University specifically failed to dispute the following statements:

> On April 17, 1987, Scott's father, Cleon Hartman, was employed by BellSouth Corporation, and was covered by BellSouth's self-insured ERISA Plan. Scott was a third party beneficiary of the ERISA coverage.

> *****************************************************

---

[4] Rankin is employed as a general attorney with BellSouth, providing legal services and counsel with respect to the administration of BellSouth's ERISA Plan.

All medical expenses paid by BellSouth in behalf of Hartman were made subject to the ERISA subrogation provision....

In addition to these admissions, the University included statements within its own pleadings suggesting or indicating that BellSouth had a contractual obligation to pay Hartman's medical expenses under the ERISA Plan. In its Statement of Undisputed Material Facts, filed in support of defendants' Motion for Summary Judgment, the University stated that "[f]or a period of time following Scott's injury, BellSouth's insurer, Blue Cross/Blue Shield, also paid a portion of Scott's medical care costs. These payments were made because at the time of Scott's accident Cleon Hartman had insurance coverage through his employer, BellSouth, which coverage extended to Scott as a member of the immediate family." The University further acknowledged that "while the bulk of Scott's medical bills during the first years following Scott's injury were paid by BellSouth that payment was caused by BellSouth's contractual obligation to Cleon Hartman, not by any refusal of the University to assume responsibility for Scott's medical treatment...."

We note further that the Commission found indisputable evidence that BellSouth "did not make such payments as a volunteer, but as a result of the legally enforceable contractual obligation which it owed to Scott under the ERISA plan." As support for this conclusion, the Commission cited to the following admission from the University's trial brief:

In the university's brief filed on February 8th, 2002, the university says that "Cleon Hartman had a health insurance contract with his employer, BellSouth, under which Scott was provided coverage as Cleon's dependent." "BellSouth paid a portion of Scott's medical care costs pursuant to its contractual obligation to Cleon Hartman."

For these reasons, we find that there is undisputed evidence in the record to indicate that Scott Hartman was an enrolled eligible dependent in the ERISA Plan, and that BellSouth had a contractual obligation to pay Scott Hartman's medical expenses pursuant to this plan.

The University next raises the question of whether the Commission erred in concluding that BellSouth's subrogation rights were contractual in nature. In defining the parameters of contractual or conventional subrogation, our Supreme Court noted that "[s]ubrogation given by agreement or stipulation is known as conventional subrogation." *Tennessee Farmers' Mut. Ins. Co. v. Rader*, 410 S.W.2d 171, 173 (Tenn. 1966) (citing *United States Fidelity & Guaranty Co. v. Elam*, 198 Tenn. 194, 278 S.W.2d 693 (1955)). The Court further recognized that '[i]n conventional subrogation the extent of the right is measured by the agreement for subrogation, and by the rights of the person granting the right." *Rader*, 410 S.W.2d at 173 (quoting 83 C.J.S. *Subrogation* § 4).

Legal or equitable subrogation, on the other hand, "arises by operation of law where a person, other than a mere volunteer, having a liability or a right or a fiduciary relationship in the premises, pays a debt due by another under such circumstances that he or she is in equity entitled to the security

or obligation held by the creditors whom he or she has paid." 83 C.J.S. *Subrogation* § 4 (2000). Unlike contractual subrogation, "[t]he right of legal subrogation is not created by contract. It does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect." *Id*.

The crux of the University's argument is that BellSouth has no contractual subrogation rights as there is no evidence to suggest that Scott Hartman was a "Participant" under the ERISA Plan. On this basis, the University asserts that BellSouth's subrogation rights are equitable, rather than contractual in nature. However, because we have found that Scott Hartman was an enrolled Eligible Dependent under the ERISA Plan, we dismiss defendants' contention that BellSouth is foreclosed from asserting contractual subrogation rights on the theory that no contract existed between BellSouth and Scott Hartman.

To determine whether BellSouth has contractual subrogation rights, we must look to the express terms of the contract, and specifically the subrogation clause within. Courts are to interpret and enforce the contract as written, according to its plain terms. *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355, 358 (1955). If a contract is plain and unambiguous, the meaning thereof is a question of law for the court. *Id*.

According to claimants' Concise Statement of Undisputed Facts, all medical expenses paid by BellSouth on Scott Hartman's behalf were made "subject to" the following subrogation provision contained within the ERISA Plan:

> If the Claims Administrator pays or provides any benefits for a Participant under this Plan, it is <u>subrogated</u> to all rights of recovery which that Participant has in contract, tort, or otherwise against any person or organization for the amount of benefits paid or provided. That means that the Claims Administrator may use the Participant's right to recover money from that other person or organization.

(Emphasis in original).

From our reading of this provision, it is apparent that the plain and unambiguous terms of the subrogation clause provide BellSouth with a contractual right to subrogation in this case. The record indicates that BellSouth (Claims Administrator) paid $1,223,515.29 toward medical expenses incurred by Scott Hartman (Participant) under the ERISA Plan. As determined by the Commission in its Order of September 27, 1989, the University had a contractual obligation to "provide reasonable medical treatment appropriate to Scott Hartman's condition without limitation as to time or dollar limit." Therefore, by the terms of the subrogation provision cited above, BellSouth is "subrogated to all rights of recovery [that Scott Hartman] has in contract" against the University.

The University's final argument against summary judgment is that the Commission erred in "concluding that BellSouth's subrogation rights were superior to those of the University." The

University's argument relies exclusively on the theory that BellSouth possessed, at best, only an equitable subrogation right. We find the University's argument unpersuasive.

As stated, the subrogation clause contained in the ERISA plan provides BellSouth with a contractual right of subrogation. The University's policy with National, in contrast, contains no such provision. The purpose of the subrogation doctrine "is the prevention of injustice." *See* 83 C.J.S. *Subrogation* § 3 (2000). "[Subrogation] is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity, and good conscience, should pay it." *Id*. In considering the competing subrogation interests of two parties, only one of whom has contractually negotiated for such a right, we find that the principles of equity, justice, and fairness, under the particular circumstances of this case, mandate recovery in favor of BellSouth as the party possessing a contractual right of subrogation.

For the above reasons, we affirm the Commission's decision permitting BellSouth to recover $1,223,515.29 from the University for medical expenses paid on behalf of Scott Hartman under the ERISA Plan.[5]

## II.

Claimants' sole issue for review is whether the Commission erred in failing to award prejudgment interest to BellSouth. Specifically, claimants seek an award of prejudgment interest covering the time period from "February 1, 1990 (the date upon which BellSouth made its last payment and this claim was therefore liquidated) through the date the Judgment is ultimately paid."

Prejudgment interest is authorized by T.C.A. § 47-14-123 (2001) and is discretionary with the court. *B.F. Myers & Son of Goodlettsville, Inc. v. Evans*, 612 S.W.2d 912 (Tenn. Ct. App. 1980). In *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998), our Supreme Court stated:

> An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). This standard of review clearly vests the trial court with considerable deference in the prejudgment interest

---

[5] We note that the University raised two additional issues on appeal, both of which we condense into the single issue of whether the Commission erred in granting summary judgment in favor of BellSouth, as at least a genuine issue of material fact exists as to whether the University breached its contract with Scott Hartman. To reiterate, the Commission's September 27, 1989 Order states that the University had a contractual obligation to "provide reasonable medical treatment appropriate to Scott Hartman's condition without limitation as to time or dollar amount." The parties do not dispute the reasonableness of the care or treatment that is the basis for BellSouth's recovery claim. Therefore, we find that the University had a contractual obligation to pay for said treatment and care, thus rendering the issue of whether the University has breached the athletic scholarship contract irrelevant.

-10-

decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found. *See State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978) (applying abuse of discretion standard to trial court's decision to deny request for suspended sentence), *cert. denied*, 439 U.S. 1077, 99 S. Ct. 854, 59 L. Ed. 2d 45 (1979).

Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. T.C.A. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Otis*, 850 S.W.2d at 446.

*Id*. at 927.

The Supreme Court also noted that in addition to the principles of equity discussed prejudgment interest may be allowed when the amount of the obligation is certain and can be ascertained by proper accounting, and there is no reasonable dispute about the amount.

In denying an award of prejudgment interest to BellSouth, the Commission determined:

As to the fourth issue, an award of prejudgment interest is within the discretion of this Commission, taking into consideration all factors including, but not limited to, whether the liability was liquidated, the merits of the respective parties, and the diligence of the parties in pursuing the litigation. *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998); *Scholz v. S.B. Intern., Inc.*, 40 S.W.2d 78 (Tenn. Ct. App. 2000). This Commission notes that this claim has dragged on for fourteen years. This Commission also notes that BellSouth obviously was aware of the progress of this litigation, and of its interest in it, from the beginning. However, it chose not to intervene until March 1999. This Commission also takes note of the complexity of the issues involved in this litigation. In light of these facts, and after consideration of the entire record, this Commission awards no prejudgment interest.

Based on our review of the record, we find that the Commission's decision denying an award of prejudgment interest did not constitute a manifest or palpable abuse of discretion. As noted by the Commission, BellSouth was or should have been aware of its interest in this litigation from its inception in April 1988. The ERISA Plan under which Scott Hartman's medical expenses were covered contained a clear subrogation provision entitling BellSouth to pursue recovery of expenses against the University. The inclusion of this clause in the ERISA Plan indicates that BellSouth knew, or should have known, of its right to seek recovery.

Claimants assert that BellSouth has been unfairly deprived of the use of these expenses as a result of the University's calculated efforts to delay final judgment, and the Commission's protracted efforts to rule on claimants' 1996 Summary Judgment Motion. However, claimants' urgency to recovery these funds is beset by the fact that BellSouth waited approximately ten years to join the lawsuit and assert a claim for recovery.

For these reasons, we affirm the decision of the Commission denying an award of prejudgment interest to BellSouth.

### III.

In conclusion, we affirm the Order of the Commission awarding BellSouth a judgment for $1,026,666.71 against the University. We further affirm the Commission's ruling denying prejudgment interest to BellSouth. Costs of the appeal are assessed to the University of Tennessee and its surety, if any.

_____
_                                      W. FRANK
CRAWFORD, PRESIDING JUDGE, W.S.